UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

NANNY L. AVERY,                          )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )     No.  1:06CV167 FRB
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )

## MEMORANDUM AND ORDER

         This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.   All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

         On January 27, 2004, plaintiff Nanny L. Avery filed an
application for Disability Insurance Benefits pursuant to Title II,
42 U.S.C. §§ 401, et seq., in which she alleged that she became
disabled on June 9, 2003. (Tr. 74-76.)  On initial consideration,
the Social Security Administration denied plaintiff's claim for
benefits. (Tr. 38, 55-60.)  On April 11, 2005, upon plaintiff's
request, a hearing was held before an Administrative Law Judge
(ALJ). (Tr. 19-37.)  Plaintiff testified and was represented by
counsel.  A medical expert also testified at the hearing.  On May
4, 2005, the ALJ issued a decision denying plaintiff's claim for
benefits. (Tr. 11-18.)  Upon review of additional medical records,

the Appeals Council denied plaintiff's request for review of the ALJ's decision.[1]  (Tr. 5-8.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on April 11, 2005, plaintiff testified in response to questions posed by the ALJ and counsel.  At the time of the hearing, plaintiff was fifty-four years of age.  (Tr. 24.) Plaintiff is married and lives with her husband who is retired. Plaintiff has two grown children.  (Tr. 32-34.)

Since 1970, plaintiff worked as a machine operator in an automotive factory.  (Tr. 32, 81.)  Plaintiff testified that she can no longer work because she tires easily.  Plaintiff testified that she also experiences stress from the change in her working conditions which occur every six weeks to three months at the factory.  (Tr. 34.)  Plaintiff testified that there is also stress on the job when the machine goes down and she must wait for help. (Tr. 35.)  Plaintiff also testified that operating the foot pedals, which she is required to do for her job, causes her to experience gynecological pain.  (Tr. 34.)  Plaintiff testified that she previously took medical leave from her job due to stress.

---

[1]The Appeals Council's Notice of Action appears to be undated. The Court Transcript Index indicates that such Notice of Action was dated September 19, 2006 (Tr. 2), and plaintiff avers as such in her Complaint.

Plaintiff testified that her doctors did not advise her to leave her job, and that her mental health doctor thought she should return to work. (Tr. 35.)[2]

Plaintiff testified that she takes medication for diabetes, cholesterol and blood pressure. (Tr. 26.) Plaintiff testified that she also takes Paxil and was currently undergoing mental health treatment. (Tr. 27.)

Plaintiff testified that she sometimes has trouble remembering things, but that she has had no problem with concentration. (Tr. 34-35.) Plaintiff testified that she has had no trouble getting along with her coworkers. (Tr. 35.)

As to her daily activities, plaintiff testified that with her work, she must sleep during the day. Plaintiff testified that when she awakens, she prepares supper for herself and her husband. Plaintiff also testified that because of her day-sleeping, she is unable to perform housework. (Tr. 34.) Plaintiff testified that she also does not clean often because she tires easily. Plaintiff testified that she can drive and that she goes shopping. (Tr. 33.)

B.    Testimony of Medical Expert

Dr. Morris Alex testified as a medical expert at the

---

[2]In her opening statement, plaintiff's counsel advised the ALJ that plaintiff had recently returned to work but was having difficulty and would not be able to continue. Counsel asked the ALJ to consider plaintiff's current working status as a work attempt. (Tr. 21.) In her Brief in Support of the Complaint, plaintiff avers that she continued to work until July 1, 2005. (Pltf.'s Brief at p. 7.)

hearing and based such testimony upon his review of the medical records in the case file, with the last entry of such records dated June 2004.

Dr. Alex testified that the medical records showed plaintiff to have undergone successful surgery in February 2003 for thyroid cancer, and that such cancer was not present in the lymph nodes nor had metastasized. Dr. Alex testified that plaintiff's thyroid cancer condition therefore did not meet part A or part B of Listing 13.08, carcinoma of the thyroid. (Tr. 27.) Dr. Alex also testified that there was no evidence of any side effects or residuals from plaintiff's thyroid surgery and that plaintiff was not functionally impaired nor suffered any functional limitations as a result. (Tr. 28, 29.) Dr. Alex testified that plaintiff's condition would have to continually be observed, but that the surgery successfully removed the carcinoma. Dr. Alex testified that, therefore, plaintiff's thyroid cancer was not a severe impairment. (Tr. 28.)

With respect to plaintiff's diabetes, Dr. Alex testified that the medical records showed there to be ophthalmological evidence in December 2002, and specifically that plaintiff had dot hemorrhages. Dr. Alex testified that plaintiff's visual acuity was nevertheless 20/20 and that, therefore, plaintiff did not meet the A, B or C criteria of Listing 9.08, diabetes mellitus. (Tr. 29.) Dr. Alex testified that plaintiff's diabetes appeared to be

reasonably controlled and that plaintiff suffered no functional limitations as a result of the condition. (Tr. 30.)

With respect to plaintiff's depression, Dr. Alex testified that the medical records showed plaintiff to be under the care of a mental counselor, but that she did not meet the criteria for Listing 12.04, affective disorder. Specifically, Dr. Alex testified that plaintiff was diagnosed in December 2003 with reactive depression but was assigned a Global Assessment of Functioning (GAF) score of 61-70 at that time. (Tr. 30.) Dr. Alex testified that such a GAF score indicated that plaintiff could function fairly well. (Tr. 31.) Dr. Alex also testified that plaintiff reported in January 2004 that, with medication, she was feeling better. Dr. Alex testified that in April and June 2004, plaintiff was noted to be doing better with improved mood and was responding well to treatment. (Tr. 30.)

Dr. Alex concluded his testimony by observing that plaintiff had a great work record as a machine operator for thirty years, but that whether plaintiff could function at a level expected by her employer is irrelevant to whether plaintiff met the Listings of Impairments. Dr. Alex testified that although plaintiff's employer felt that she could not handle the job she had performed very successfully, there was nothing in the medical evidence which showed plaintiff to be precluded from performing light or sedentary work. (Tr. 31-32.)

### III. Medical Records[3]

In June and July 1998, plaintiff visited gynecologist Dr. Robert Young at Kneibert Clinic and complained of having experienced pelvic pain for months. (Tr. 281-82.) Dr. Young noted a recent pelvic ultrasound to show an enlarged uterus and endometrium. (Tr. 282.) An endometrial biopsy was performed (Tr. 282), the results of which showed secretory phase endometrium with no evidence of endometritis, hyperplasia or malignancy. On July 10, 1998, Dr. Young noted that plaintiff seemed to be doing well. (Tr. 280.)

Dr. Young examined plaintiff on June 14, 1999, and noted plaintiff to be obese, with a weight of 274 pounds and height of five feet, five inches. Dr. Young opined that plaintiff was at a "[r]elatively stable state at this time between her obesity and diabetes" with no apparent gynecologic difficulties at the time. (Tr. 279.)

Plaintiff visited Dr. Zackwire Parr on September 16,

---

[3]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of treatment notes and reports from Larry T. Allen dated June 24 to October 18, 2005 (Tr. 361-80); records from Kneibert Clinic dated June 15, 2004, to December 14, 2005 (Tr. 381-98); and treatment notes and records from Dr. Robert C. Young dated June 4, 2001, to October 4, 2005 (Tr. 399-435). The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

1999, in relation to complaints of pain and discomfort about her left big toe. Plaintiff complained that she was having difficulty wearing shoes and experienced excessive pressure while wearing shoes and with walking. Dr. Parr diagnosed plaintiff with diabetic painful and debilitating onychomycosis,[4] and Lamisil was prescribed. Nail reduction was also performed. (Tr. 250.)

Plaintiff returned to Dr. Parr on December 16, 1999, with continued complaints of pain and discomfort about the left big toe. Dr. Parr diagnosed chronic onychomycosis, which was getting progressively worse. Oxistat Creme was prescribed, and nail reduction was performed. (Tr. 250.)

On March 9, 2000, plaintiff visited Dr. Parr for follow up of her onychomycosis, and complained of tingling and burning in the left first and second toes. Dr. Parr noted there to be decreased sensation about the toes possibly secondary in nature to diabetic neuropathy. Signs of onychomycosis were still present, but plaintiff reported no current pain. Plaintiff was diagnosed with onychomycosis and diabetes with neuropathy, and Lamisil was prescribed. (Tr. 250.)

From June 2000 through June 2004, plaintiff visited Dr. Parr every three months and complained of continued pain and discomfort while wearing shoes due to excessive pressure. Dr. Parr continually noted plaintiff's condition to be getting progressively

---

[4]Fungal nail infection. <u>Medline Plus</u> (updated Oct. 26, 2006)<http://www.nlm.nih.gov/medlineplus/ency/article/001330.htm>.

worse.  On each occasion, Dr. Parr continued in his diagnosis of
painful and debilitating onychomycosis, and nail reduction was
performed.  (Tr. 243-49.)

On May 31, 2001, plaintiff underwent a pelvic ultrasound
at Kneibert Clinic in response to her complaints of pelvic pain.
Other than an enlarged uterus, the results of the ultrasound were
unremarkable.  (Tr. 284.)

On June 4, 2001, plaintiff visited Dr. Young and
complained of pelvic discomfort and pressure.  (Tr. 272.)  Results
of an endometrial biopsy were benign.  (Tr. 274.)

On June 6, 2001, plaintiff visited Dr. Robert L. Hall at
Three Rivers Healthcare for complaints relating to constipation.
Dr. Hall noted plaintiff's current medications to include
Glyburide, Glucophage,[5] Relafen,[6] and Motrin, and that plaintiff had
been treated for diabetes within the previous seven years.  Dr.
Hall observed plaintiff to be "so obese" such that complete
examination was made difficult.  Dr. Hall noted plaintiff's blood
pressure to be slightly elevated and instructed plaintiff to
monitor it and to see Dr. Varma if there were any concerns.  Dr.
Hall assessed plaintiff as having, inter alia, history of diabetes,

---

[5]Glyburide and Glucophage are used to treat type II diabetes.
Physicians' Desk Reference 706, 1005-06 (55th ed. 2001).

[6]Relafen is indicated for acute and chronic treatment of signs
and symptoms of osteoarthritis and rheumatoid arthritis.
Physicians' Desk Reference 3120-21 (55th ed. 2001).

obesity and degenerative joint disease. (Tr. 353-56.)

In response to plaintiff's complaints of irregular menses (Tr. 261, 271), plaintiff underwent diagnostic dilatation and curettage on August 21, 2001, to rule out endometrial carcinoma. Dr. Young noted that plaintiff had an enlarged uterus and experienced pelvic discomfort and pressure but was not "unusually uncomfortable." (Tr. 285-91.) The results of the procedure were benign. (Tr. 285.) From August 27, 2001, through July 25, 2003, plaintiff visited Dr. Young on six occasions. No complaints of pelvic pain or discomfort were recorded during these visits. (Tr. 257-60, 264-69.)

On September 3, 2002, plaintiff visited Dr. Kean D. Griffith at Kneibert Clinic for evaluation of ulcers on the left leg. Dr. Griffith noted plaintiff to have been with her job for thirty-two years with chronic standing, and that plaintiff was obese. Dr. Griffith diagnosed plaintiff with chronic venous stasis disease and prescribed support hose. (Tr. 207-08.)

Plaintiff visited the ophthalmology department at Kneibert Clinic on December 23, 2002, and complained of having momentary "glares" with slight blurred vision. It was noted that plaintiff needed a new prescription for her safety glasses at work. (Tr. 202.) Dr. Prem Varma noted this ophthalmology evaluation to be negative. (Tr. 201.)

On January 6, 2003, plaintiff underwent diagnostic

testing in response to stroke-like complaints of glazing in the right eye, diabetes, and memory loss. Carotid sonogram was within normal limits. An echocardiogram showed trace of aortic, mitral and tricuspid insufficiency with mild concentric LVH. Mild aortic valve sclerosis was also noted. Follow up echocardiogram in one year was recommended. (Tr. 198-99.)

On that same date, January 6, 2003, plaintiff underwent a thyroid sonogram in response to observations of a thyroid lesion as demonstrated on the carotid sonogram. A mass measuring 3.6 centimeters in size was detected in the left lobe of the thyroid gland with increased surrounding vascular flow. Dr. Cedric Strange noted this to be a suspicious finding and further evaluation was recommended. (Tr. 197.) On January 14, 2003, Dr. Parma diagnosed plaintiff as having a thyroid nodule. (Tr. 195.)

Plaintiff was admitted to Three Rivers Healthcare on February 4, 2003, to undergo left thyroid lobectomy for removal of the thyroid nodule. (Tr. 308-10.) Dr. Griffith noted plaintiff's current medications to include Glucophage, Glyburide, Motrin, and Aygestin.[7] (Tr. 308.) Plaintiff underwent such lobectomy that same date without complication (Tr. 311-12), and was discharged from Three Rivers on February 5, 2003 (Tr. 339). Pathology reports showed the mass to be cancerous. (Tr. 193.)

---

[7]Aygestin is indicated for the treatment of secondary amenorrhea, endometriosis and abnormal uterine bleeding due to hormonal imbalance. Physicians' Desk Reference 1218-19 (55th ed. 2001).

On February 14, 2003, plaintiff visited Dr. Narayana G. Memula upon referral from Dr. Griffith for follow up of her previous surgery. It was noted that plaintiff had Stage II thyroid cancer and various treatment options were discussed. (Tr. 303-06.) It was determined that plaintiff would undergo radioactive body scan and would return for follow up in six weeks. (Tr. 305.)

As a result of plaintiff's radioactive scan which was performed on April 17, 2003, it was determined on April 29, 2003, that plaintiff would undergo radiation therapy for her thyroid cancer. (Tr. 300-02.) Plaintiff continued to visit Three Rivers Cancer Treatment Center through August 20, 2003, for radioactive thyroid ablation treatment. (Tr. 294-299.) Upon conclusion of such treatment, it was determined that plaintiff's condition was stable and no further treatment was recommended. (Tr. 294-95.)

On May 15, 2003, plaintiff reported to Dr. Varma that she had no new problems. (Tr. 189-90.)

On August 13, 2003, plaintiff reported to Dr. Varma that she was under some stress and felt a bit depressed. Plaintiff reported no other problems. Dr. Varma noted plaintiff to be teary but not to have any suicidal or homicidal thoughts. It was noted that plaintiff took Glucophage and was on a low sugar diet, but did not check her sugar. Plaintiff reported that she would like to be off of work for a little while, which Dr. Varma thought was

reasonable.  (Tr. 188.)  Paxil[8] was prescribed.  (Tr. 187.)

On August 22, 2003, plaintiff visited Dr. Varma and reported that she felt good.  Dr. Varma noted plaintiff to be status post surgery for thyroid cancer and was now hypothyroid. Synthroid[9] was prescribed and plaintiff was instructed to follow up in one month.  (Tr. 185.)

On September 22, 2003, plaintiff reported to Dr. Varma that she was fatigued and had no energy.  Dr. Varma noted plaintiff to continue to have depression.  Plaintiff had no suicidal or homicidal thoughts.  Plaintiff reported that she could not work secondary to her depression, and Dr. Varma determined for plaintiff to remain off of work for an additional month.  Dr. Varma determined to increase plaintiff's dosage of Paxil and encouraged plaintiff to see a psychiatrist.  Xanax[10] was also prescribed.  Dr. Varma also noted plaintiff not to be compliant with her diet, and plaintiff was encouraged to lose weight.  (Tr. 182-83.)

On November 4, 2003, plaintiff reported to Dr. Varma that her anxiety and depression had improved with Paxil and Xanax, but that she continued to experience the conditions.  Plaintiff

---

[8]Paxil is indicated for the treatment of depression. Physicians' Desk Reference 3114-15 (55th ed. 2001).

[9]Synthroid is indicated as replacement or supplemental therapy in patients with hypothyroidism.  Physicians' Desk Reference 1641 (55th ed. 2001).

[10]Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety.  Physicians' Desk Reference 2650 (55th ed. 2001).

reported to Dr. Varma that she was unable to work due to her anxiety. Dr. Varma noted plaintiff to be compliant with her medications. Plaintiff was referred to psychiatry and Dr. Varma determined to place plaintiff on temporary disability until she saw a psychiatrist. (Tr. 180-81.)

On November 14, 2003, Dr. Varma determined to increase plaintiff's dosage of Synthroid. (Tr. 181.)

Plaintiff visited Dr. Varma on November 26, 2003, for Glucophage follow up. It was noted that plaintiff was compliant with her medications and reported no problems. (Tr. 178-79.)

On November 26, 2003, plaintiff visited counselor and nurse practitioner Debbie Price at the Kneibert Clinic. Plaintiff complained of multiple problems with a family member who had cancer. Ms. Price noted plaintiff to be on medical leave due to thyroid cancer. Plaintiff reported that she enjoys life and experiences sadness less than fifty percent of the time. Plaintiff reported that her concentration is good, but that she feels guilty that her husband is taking care of her sister. Plaintiff reported that her energy level varies and that she lacks energy on some days. It was noted that plaintiff had been taking Paxil for more than two months due to increased stress caused by multiple family members having cancer. Plaintiff reported still having depression. Plaintiff reported having experienced episodes of shakiness, racing heart, increased respiration, and increased perspiration. (Tr.

175.)  Ms. Price diagnosed plaintiff with major depression (first episode) and determined to rule out generalized anxiety disorder and adjustment disorder.  Ms. Price noted plaintiff's stressors to include moderate problems with her primary support group, including death of family members; occupation problems, including her medical leave; and a mentally challenged sister.  Plaintiff was assigned a Global Assessment of Functioning (GAF) score of 61-70.  Plaintiff was instructed to increase her dosage of Paxil.  (Tr. 176.)

On December 22, 2003, Ms. Price noted plaintiff to be doing very well with her medication.  Plaintiff reported to Ms. Price that she was coming to realize that she was physically incapable of caring for her mentally challenged sister, that she felt guilt on account thereof, and was having difficulty dealing with it.  Mental status examination was unremarkable.  Plaintiff reported having auditory and visual hallucinations but reported that they are always associated with sleep.  Plaintiff's judgment and insight were noted to be fair.  Ms. Price diagnosed plaintiff with major depressive disorder with questionable psychotic features.  Plaintiff was instructed to continue with Paxil.  (Tr. 174.)

On January 19, 2004, plaintiff reported to Ms. Price that she felt better and had made several difficult decisions regarding her sister.  Plaintiff reported that she felt she could not return to work due to increased stress.  Ms. Price noted plaintiff to be

unable to tolerate multiple changes. Plaintiff reported no side effects from her medications and that she had been sleeping fairly well. Mental status examination was unremarkable. Plaintiff reported no auditory hallucinations and Ms. Price noted plaintiff's visual hallucinations associated with sleep to have much improved. Plaintiff was instructed to continue with Paxil and to return in six weeks. (Tr. 173.)

During an oncology follow up on January 29, 2004, it was noted that plaintiff complained of generalized tiredness. (Tr. 172.)

On February 6, 2004, plaintiff visited Dr. Varma for review of medications. Dr. Varma noted plaintiff not to have any complaints and to be compliant with her medications. (Tr. 169.)

Plaintiff returned to Ms. Price on March 1, 2004, and reported feelings of increased guilt concerning her sister. Ms. Price noted plaintiff's mood to be anxious. Ms. Price diagnosed plaintiff with major depressive disorder-recurrent, and instructed plaintiff to increase her dosage of Paxil due to increased anxiety. (Tr. 170.)

On March 19, 2004, plaintiff visited Dr. Varma for review of medications. Dr. Varma noted plaintiff not to have any complaints and to be compliant with her medications. (Tr. 168.)

Plaintiff visited Ms. Price on April 12, 2004, and reported that she was doing better. Plaintiff reported that she

felt that Paxil was working. Plaintiff reported to be sleeping fairly well but that she frequently awakens. Ms. Price noted plaintiff not to be working, and plaintiff expressed her belief that she could not work due to increased anxiety. Mental status examination was unremarkable. Ms. Price diagnosed plaintiff with major depressive disorder-recurrent, and instructed plaintiff to continue with Paxil. (Tr. 167.)

On May 6, 2004, plaintiff visited Dr. Varma for review of medications. Dr. Varma noted plaintiff not to have any complaints and to be compliant with her medications. (Tr. 166.)

On that same date, May 6, 2004, plaintiff visited Ms. Price who noted plaintiff to be doing better. It was noted, however, that plaintiff was sleeping poorly and had frequent interruptions. Plaintiff reported that she is frequently tired and is under increased stress due to caring for her sister. Plaintiff reported having feelings of guilt for placing her sister in a nursing home. Plaintiff reported that she felt she could not work due to anxiety and stress. Mental status examination was unremarkable. Plaintiff was diagnosed with major depressive disorder and was instructed to continue with Paxil. (Tr. 165.)

On May 12, 2004, Ms. Price completed a Medical Source Statement - Mental on behalf of plaintiff. In the Statement, Ms. Price opined that plaintiff was moderately limited in her ability to carry out detailed instructions, to work in coordination with or

proximity to others without being distracted, and to be aware of normal hazards and take appropriate precautions. In all other areas, including the entire domains of Understanding and Memory, and Social Interaction, Ms. Price opined that plaintiff was not significantly limited. (Tr. 254-55.)

On May 17, 2004, Dr. Varma wrote the following: "To Whom it May Concern: Ms. Avery has had problems with depression treated with Paxil and I have had to refer her to psychiatry. It is my opinion that the patient is disabled because of her depression." (Tr. 252.)

On June 15, 2004, plaintiff visited Ms. Price who noted plaintiff to be doing well and responding well to medication. Plaintiff reported her mood to have improved since making some personal decisions. Mental status examination was unremarkable. Plaintiff was diagnosed with major depressive disorder-recurrent, and was instructed to continue with Paxil. (Tr. 164.)

On July 6, 2004, plaintiff returned to Dr. Varma for a check on her medications. Dr. Varma noted plaintiff to feel good without complaint, and plaintiff's medications were adjusted. (Tr. 163.)

On July 13, 2004, plaintiff reported to Dr. Young that she was having a recurrence of an umbilical hernia which plaintiff believed was worsening. It was noted that plaintiff was referred to Dr. Hall for this condition. (Tr. 408.)

Plaintiff visited Ms. Price on July 28, 2004, who noted plaintiff to be doing fairly well and to be responding well to medication. Plaintiff reported feeling better after placing her sister in a nursing home. Mental status examination was unremarkable. Ms. Price continued in her diagnosis of plaintiff and ordered Paxil. No prescription was given, however. (Tr. 162.)

Plaintiff returned to Dr. Varma on August 2, 2004, for a check on her medications. Dr. Varma noted plaintiff to have sinus drainage and congestion, but no other complaints. Plaintiff was noted to be compliant with her medications. (Tr. 161.)

On August 13, 2004, plaintiff visited Ms. Price and reported that she was doing well and was having no depression. It was noted that plaintiff had had an abdominal infection and was in pain. Plaintiff's mood was observed to be fairly stable. Mental status was unremarkable. Ms. Price continued in her diagnosis of major depressive disorder-recurrent. Plaintiff reported to Ms. Price that she felt she could not work due to her mental and physical condition. (Tr. 397.)

On September 7, 2004, plaintiff returned to Dr. Varma for follow up on recent blood work. Dr. Varma noted plaintiff's potassium level to be borderline elevated and plaintiff's blood pressure to be 140/90. Dr. Varma discussed various strategies to bring plaintiff's blood pressure down to less than 130/80. Plaintiff was instructed to return in a week to ten days. (Tr.

152-53.)

Plaintiff returned to Dr. Varma on September 14, 2004, who noted plaintiff's blood pressure to be good. Dr. Varma determined not to institute anti-hypertensive medication. Plaintiff was instructed to check her blood pressure two or three times a week and to return for follow up in one month. (Tr. 150-51.)

Plaintiff visited Ms. Price on September 24, 2004, for medication evaluation. Plaintiff reported that she was experiencing increased stress due to her son's divorce. Mental status examination was unremarkable. Ms. Price continued in her diagnosis of plaintiff and instructed her to continue with Paxil. Ms. Price noted plaintiff to continue to make progress on medication. The possibility of returning to work was discussed, and it was noted that such would be further discussed in November. (Tr. 394.)

On October 12, 2004, Dr. Varma noted plaintiff's blood pressure to be slightly elevated. Dr. Varma instructed plaintiff to continue monitoring her blood pressure and to follow up in a couple of months. Dr. Varma indicated that medication may be started at that time if plaintiff's blood pressure remained elevated. (Tr. 148-49.)

On November 15, 2004, plaintiff reported to Ms. Price that she was doing well and had no anxiety problems. No depressive

symptoms were noted.  Ms. Price observed plaintiff to be much improved since the beginning of her treatment.  Mental status examination was unremarkable.  Plaintiff was diagnosed with major depressive disorder-recurrent, without psychotic features. Plaintiff was instructed to continue with Paxil.  It was noted that plaintiff was to return to work on November 22.  (Tr. 393.)

Plaintiff returned to Ms. Price on November 22, 2004, and reported that she was waiting to see if she would receive long-term disability.  Ms. Price diagnosed plaintiff with major depressive disorder-recurrent, without psychotic features, but noted it to be mild.  Plaintiff was instructed to continue with Paxil.  Ms. Price stated that she would give plaintiff an additional week off of work.  (Tr. 392.)

Plaintiff visited Dr. Varma on December 10, 2004, who noted plaintiff to feel good without complaint.  Dr. Varma noted plaintiff to be compliant with her medications.  (Tr. 146.)

Plaintiff returned to Dr. Varma on February 10, 2005, who noted plaintiff to be without complaint and to be taking her medications.  Dr. Varma reviewed plaintiff's medications for diabetes mellitus, hypercholesterolemia and hypothyroidism, and instructed her to return for follow up in two months.  (Tr. 143-44.)

Plaintiff visited Ms. Price on February 10, 2005, and reported that she continued to have depression but that she had not

been taking her medication because she thought it might make her sleepy. It was noted that plaintiff had returned to work but that it was difficult. Plaintiff reported that she was frustrated because "[she] thought [she] was out of there." Ms. Price diagnosed plaintiff with major depressive disorder-recurrent, without psychotic features. Ms. Price instructed plaintiff to take Paxil CR, noting that it did not cause sedation. Ms. Price instructed plaintiff to call if she experienced any increase in sedation. (Tr. 391.)

Plaintiff returned to Ms. Price on March 10, 2005, and reported that she was having medical problems, including hypertension and hypoglycemia. Plaintiff reported that Paxil CR did not make her drowsy, but that she did not want to increase her dosage. Plaintiff was instructed to continue with her medication. (Tr. 390.)

On May 5, 2005, plaintiff reported to Ms. Price that she was doing fairly well and felt she was back to normal. Plaintiff reported that she did not enjoy her work and that she was working nights. Ms. Price noted plaintiff to have a mildly depressed mood. Ms. Price noted plaintiff's active problems to include diabetes mellitus, hypercholesterolemia, hypothyroidism, antihyperlipidemic use, essential hypertension, and major depression-recurrent-severe-without psychotic behavior. Ms. Price also noted plaintiff's

current medications to include Paxil, Premarin, Zocor,[11] Synthroid, Glipizide,[12] Lisinopril,[13] Avandia,[14] Glucophage, and Paxil CR. (Tr. 388-89.)

Plaintiff visited Dr. Young on June 9, 2005, and complained of discomfort in the right lower quadrant area. Physical examination showed nothing abnormal. (Tr. 406.)

Plaintiff underwent diagnostic testing on June 10, 2005, in response to her complaints of right lower quadrant pain. Mild degenerative arthritis was noted. (Tr. 424-25.) Additional diagnostic tests performed on June 13, 2005, showed plaintiff's uterus to be prominent in size with a possible small uterine fibroid noted. (Tr. 422.)

On June 13, 2005, Dr. Young noted plaintiff to be in a bind in that she engages in repetitive motion at work by operating a foot pedal, and that she experiences great discomfort by the end of the day on account thereof. Plaintiff shared with Dr. Young her

---

[11]Zocor is indicated to reduce the risk of a cardiac and/or ischemic event in persons with hypercholesterolemia. <u>Physicians' Desk Reference</u> 2054-56 (55th ed. 2001).

[12]Glipizide is indicated for the control of hyperglycemia and its associated symptomatology in patients with type II diabetes. <u>Physicians' Desk Reference</u> 2495-96 (55th ed. 2001).

[13]Lisinopril is used to treat high blood pressure. <u>Medline Plus</u> (last revised July 1, 2003; last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692051.html>.

[14]Avandia is indicated to improve glycemic control in patients with type II diabetes. <u>Physicians' Desk Reference</u> 3071-73 (55th ed. 2001).

belief that the enlarged uterus and small fibroid were causing her her pain, but Dr. Young was uncertain that the pelvic region was causing the pain. Dr. Young noted plaintiff's pain to be in her leg as well as in her pelvis. Dr. Young noted plaintiff to be markedly overweight. Dr. Young explained the difficulty in performing surgery given plaintiff's weight and diabetes. Dr. Young stated that plaintiff had "many, many, many medical problems," and noted that plaintiff was unsuccessful in her attempt to get disability. Dr. Young recommended that plaintiff visit an expert in pain management. (Tr. 404-05.)

Plaintiff returned to Dr. Young on June 22, 2005, who noted plaintiff's diabetes to be out of control. Otherwise, physical examination was unremarkable. Dr. Young determined to increase plaintiff's dosage of Glucophage. Plaintiff was instructed to return in one month. (Tr. 404.)

On June 24, 2005, plaintiff visited Larry T. Allen for initial consultation for counseling and psychotherapy. (Tr. 375-77.) It was noted that plaintiff had been diagnosed with Adjustment Disorder with Mixed Disturbance of Emotion and Conduct. Plaintiff reported that she had been having problems with depression and anxiety, and with feeling that she has not "held up her end of the bargain for her family." (Tr. 375.) Plaintiff reported that she completed high school but has difficulty with comprehension and reading. Plaintiff also reported that she was

currently working at Federal Mogul and had worked there for thirty-three years. Plaintiff reported that she was having difficulty with physical demands and stress, and that she was an insulin-dependent diabetic. Plaintiff also reported that she saw Ms. Price at Kneibert Clinic for medication. (Tr. 376.) Mr. Allen opined that individual psychotherapy would be helpful for plaintiff to deal with her depression and anxiety. (Tr. 377.)

Plaintiff visited Ms. Price on June 30, 2005, who noted plaintiff to be stable and doing well. Plaintiff was noted to have responded well to medications. Plaintiff was observed to have a mildly depressed mood. Ms. Price continued in her diagnosis of plaintiff and instructed plaintiff to continue with her medications. (Tr. 386-87.)

Plaintiff visited Dr. Young on July 20, 2005, for follow up of her diabetes. Dr. Young instructed plaintiff to begin a walking regimen after breakfast each day, and plaintiff agreed to do so. (Tr. 403.)

Plaintiff returned to Mr. Allen on July 22, 2005, and reported that she was "a little bit" depressed but felt she was doing better. Plaintiff also reported that she was having some difficulties with obsessive thinking. Plaintiff reported that she sits around the house and does nothing, at which time she begins to think about and analyze certain situations from the past. Mr. Allen opined that individual psychotherapy would be helpful for

plaintiff to deal with her depression and anxiety. (Tr. 373-74.)

On August 9, 2005, plaintiff reported to Mr. Allen that she continued to have some difficulty. Plaintiff identified additional family situations which had caused her to feel depressed and anxious. Mr. Allen counseled plaintiff as to how to approach such situations and continued to opine that individual psychotherapy would be helpful for plaintiff to deal with her depression and anxiety. (Tr. 371-72.)

Plaintiff returned to Mr. Allen on September 2, 2005, and reported that she continues to have difficulties with certain family situations which cause her to sometimes feel anxious and depressed. Mr. Allen counseled plaintiff as to how she takes on responsibilities for other people and deals with them. Mr. Allen continued to opine that individual psychotherapy would be helpful for plaintiff to deal with her depression and anxiety. (Tr. 368-70.) In a Treatment Plan completed that same date, Mr. Allen noted that goals had been set and psychotherapy was identified as the method of intervention by which plaintiff was to meet her goals by September 2006. (Tr. 378-80.)

On September 14, 2005, Ms. Price observed plaintiff to be doing fairly well with a good response to medication. Plaintiff reported to Ms. Price that she was enjoying not working. Ms. Price observed plaintiff to have a mildly depressed mood. Ms. Price continued in her diagnosis of plaintiff and instructed plaintiff to

continue with her medications.  (Tr. 384-85.)

On September 20, 2005, plaintiff reported to Mr. Allen that she was having some difficulties establishing boundaries with her family members and that she becomes very anxious with certain familial communications.  Mr. Allen observed plaintiff to be having difficulties meeting her goals.  Mr. Allen stated that he wanted to meet with plaintiff more often but that plaintiff was only willing to come every three weeks.  (Tr. 365-67.)

On October 18, 2005, plaintiff met with Mr. Allen and reported that she was doing well but was concerned about her grandson.  Plaintiff reported that she felt things had reached a plateau.  Mr. Allen opined that plaintiff was beginning to react more appropriately with her family situations.  Mr. Allen opined that plaintiff was doing a little better with her anxiety because of plaintiff's perception that the problems were gone.  Mr. Allen noted that plaintiff was feeling less depressed but continued to have difficulties with positive self-image.  (Tr. 362-64.)

Plaintiff returned to Ms. Price on December 14, 2005, who noted plaintiff to be stable.  Plaintiff reported that she continued to have some anxiety, but that therapy with Mr. Allen had helped her.  Ms. Price continued in her diagnosis of plaintiff and instructed plaintiff to continue with her medications.  (Tr. 382-83.)

## IV.  The ALJ's Decision

The ALJ found plaintiff to have met the insured status requirements of the Social Security Act on June 9, 2003, and to continue to meet them through December 31, 2008.  The ALJ found that plaintiff had not engaged in substantial gainful activity since June 9, 2003, but that plaintiff had recently returned to her job.  (Tr. 17.)  The ALJ found plaintiff's history of thyroid cancer and diabetes mellitus to be severe impairments (Tr. 15), but that such impairments did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 17.)  The ALJ found plaintiff's depression not to more than minimally affect her ability to perform work-related activities.  (Tr. 16.)  The ALJ found plaintiff's allegations of disabling fatigue not to be persuasive.  The ALJ found plaintiff to have the residual functional capacity (RFC) to perform the requirements of work except for frequently lifting in excess of ten pounds and any lifting in excess of twenty pounds.  The ALJ found plaintiff's impairments and functional limitations not to prevent plaintiff from performing her past relevant work as a machine operator.  As such, the ALJ found plaintiff not to be under a disability at any time through the date of the decision.  (Tr. 17.)

## V.  Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that

she is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  <u>See</u> 20 C.F.R. § 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines

whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068(8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff raises numerous claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff claims that the ALJ erred by finding her impairments not to meet a listed impairment; that the ALJ erred by finding plaintiff to have no non-exertional impairments and thus that the ALJ's analysis of plaintiff's RFC is flawed inasmuch as

her non-exertional impairments were not considered; and that the combination of plaintiff's exertional and non-exertional impairments mandate a finding of disability under Appendix 2 as referenced in 20 C.F.R. § 416.969a(b). In addition, plaintiff contends that the ALJ erred by finding plaintiff able to perform her past relevant work. Finally, plaintiff argues that, given her exertional and non-exertional impairments, the ALJ should have obtained the testimony of a vocational expert. The undersigned will address each of plaintiff's contentions in turn.

A.    Listed Impairment

Plaintiff states that she disagrees with the ALJ's finding that her impairments do not meet or equal one listed in 20 C.F.R. § 404.1501, et seq., Appendix 1. Plaintiff does not indicate, however, which Listing(s) she believes her impairments meet.

At Step 3 of the sequential evaluation, the burden rests with the claimant to show that her impairment matches a listed impairment. To meet this burden, the claimant must show that she meets all of the specified medical criteria of the Listing. Harris v. Barnhart, 356 F.3d 926, 928 (8th Cir. 2004). Other than a mere recitation of her diagnosed conditions, the plaintiff here has not pointed to any evidence showing that she satisfies the specific medical criteria for any Listing. Diagnoses are not by themselves sufficient to demonstrate that a claimant's condition meets the

requisite medical criteria.  Id. at 929.

To the extent plaintiff's argument can be construed to
state that the ALJ erred in finding plaintiff's impairments not to
meet Listings 13.09,[15] 9.08 or 12.04 for thyroid cancer, diabetes
mellitus or depression, respectively, plaintiff's claim continues
to be without merit.  To meet the Listing for thyroid cancer, a
claimant must have either anaplastic carcinoma,[16] or carcinoma with
metastases[17] beyond the regional lymph nodes progressive despite
radioactive iodine therapy.  20 C.F.R., Pt. 404, Subpt. P, App. 1
§ 13.09 (2006).  A review of the record here shows plaintiff's
thyroid cancer to be neither spreading nor aggressive, and further

_____

[15]The ALJ in his opinion refers to Listing 13.08 as that which
relates to thyroid cancer, and it is this reference to which
plaintiff cites in her brief.  The Regulations in effect at the
time of the ALJ's decision on May 4, 2005, and in effect at the
time the Commissioner's decision became final, that is, September
16, 2006, each set out the medical criteria for thyroid cancer at
Listing 13.09.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 13.09
(2005); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 13.09 (2006);
Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir.
2004) (court must apply Regulations in effect at time
Commissioner's decision becomes final).  The undersigned notes,
however, that the previous edition of the Regulations sets out the
medical criteria for thyroid cancer at Listing 13.08.  See 20
C.F.R. Pt. 404, Subpt. P, App. 1 § 13.08 (2004).  Inasmuch as
plaintiff fails to meet the criteria for any of these Listings, the
ALJ's error in referring to the 2004 Listing of Impairments is
harmless.

[16]Anaplastic thyroid carcinoma is an aggressive form of cancer
which grows very rapidly and is invasive.  Medline Plus (updated
May 26, 2006)<http://www.nlm.nih.gov/medlineplus/ency/article/
00352.htm>.

[17]Metastasis is the movement or spreading of cancer cells from
one organ or tissue to another.  Medline Plus (updated Oct. 30,
2006)<http://www.nlm.nih.gov/medlineplus/ency/article/002260.htm>.

shows plaintiff's condition to have been determined stable upon completion of radioactive therapy in August 2003. Plaintiff has undergone no additional treatment for thyroid cancer since.

To meet Listing 9.08 with respect to diabetes mellitus, a claimant must show

> A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station . . . ; or
>
> B. Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests . . . ; or
>
> C. Retinitis proliferans [to be evaluated ] under the criteria in [Listings] 2.02, 2.03, or 2.04.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 9.08 (2006).

A review of the record shows plaintiff not to meet any of these criteria, including the criteria set forth in Listings 2.02, 2.03 or 2.04 relating to visual acuity, contraction and efficiency, and plaintiff points to no evidence demonstrating otherwise.

With respect to plaintiff's depression, the ALJ appears to have found the condition itself not to be severe (Tr. 15) and indeed found plaintiff's depression not to have more than a minimal effect on plaintiff's ability to perform work activities (Tr. 16). Nevertheless, the ALJ found the condition not to meet Listing 12.04. (Tr. 15.) To meet Listing 12.04, a claimant must satisfy

the requirements of both parts A and B of the Listing, or satisfy the requirements of part C of the Listing, as set out below:

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even

a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.04 (2006).

A review of the record shows plaintiff not to meet all of the specific medical criteria to meet Listing 12.04. Although plaintiff's treating physician, Dr. Varma, opined in May 2004 that plaintiff's depression rendered her disabled, the undersigned notes that the issue as to whether a claimant is disabled for purposes of Social Security is one reserved to the Commissioner and is outside the province of medical sources. See 20 C.F.R. § 404.1527(e)(1); Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995); Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991). Nevertheless, as found by the ALJ, a review of the record in its entirety shows plaintiff's mental condition to have been successfully treated with medication and counseling such that her ability to perform work related activities was no more than minimally affected, and indeed that plaintiff's mental health counselor supported plaintiff's return to work.[18] The subsequent records of Ms. Price and Mr. Allen

---

[18]Notably, it was not the treating mental health professional who rendered the opinion that plaintiff's mental condition was disabling. Instead, the opinion was rendered by plaintiff's general practitioner who did not actively treat plaintiff's mental impairment subsequent to her referral for psychological treatment

showing plaintiff's continued improvement do not detract from the ALJ's finding.

Plaintiff's cursory argument that the ALJ erred by finding plaintiff not to meet a listed impairment, supported by nothing more than a list of her diagnosed conditions, is insufficient to meet her burden of demonstrating that the ALJ erred in so finding. Harris v. Barnhart, 356 F.3d 926, 928 (8th Cir. 2004). Nevertheless, a review of the record as a whole shows the ALJ's decision that plaintiff's conditions did not meet such Listings, and his reasoning therefore, to be supported by substantial evidence.

B.   Non-Exertional Impairments

Plaintiff argues that the ALJ erred by finding plaintiff not to have any non-exertional impairments and thus that the ALJ's analysis of plaintiff's RFC was therefore flawed inasmuch as her non-exertional impairments were not considered. Specifically, plaintiff contends that the record shows plaintiff to have non-exertional impairments consisting of anxiety, depression, stress, fatigue, obesity, adjustment disorder, and anxiety and panic attacks.

In his written decision, the ALJ set out and discussed plaintiff's various non-exertional impairments and addressed the effect such impairments had on plaintiff's ability to perform work.

---

in November 2003.   See 20 C.F.R. § 404.1527(d)(2)(ii), (d)(5).

(Tr. 16, 17.) With respect to plaintiff's mental impairment, the ALJ noted plaintiff to function well with treatment, such that "[h]er emotional condition did not have more than a minimal effect upon her ability to perform work related activities for any continuous period of twelve months." (Tr. 16.) The ALJ also addressed plaintiff's obesity and fatigue and determined that, with such conditions, plaintiff was unable to perform arduous or strenuous work activity. (Id.) The ALJ further found, however, that such conditions had not prevented plaintiff from performing her past light work at the factory. (Tr. 16-17.) As such, in the body of the ALJ's decision, he addressed plaintiff's non-exertional impairments and found them not to have an effect on plaintiff's ability to perform her past work. Cf. Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (non-exertional impairment accommodated by ALJ's decision limiting claimant to light work).

In the "Findings" portion of his decision, however, the ALJ found there to be "no non-exertional limitations." (See Tr. 17.) To the extent the ALJ erred in this statement, such error was harmless. As set out above, a review of the ALJ's decision in its entirety shows his determination of plaintiff's ability to perform work-related activities to have been based upon his consideration of the entire record as a whole, including plaintiff's non-exertional impairments. Indeed, the ALJ specifically identified and discussed plaintiff's non-exertional impairments, including the

evidence of record as well as plaintiff's own description of her limitations she attributed thereto. Inasmuch as the ALJ's determination of plaintiff's ability to perform work-related activities included a consideration of the effect of plaintiff's non-exertional impairments and did not hinge upon the statement made in his subsequent "Findings" that plaintiff had no non-exertional impairments, the undersigned considers such statement not to affect the substantial rights of any party and, as such, shall not regard such error as a basis for reversal of the Commissioner's decision. 28 U.S.C. § 2111 (harmless error); <u>see Sahara Coal Co. v. Office of Workers Comp. Programs, United States Dep't of Labor</u>, 946 F.2d 554, 558 (7th Cir. 1991) (harmless error analysis appropriate in judicial review of administrative adjudication); <u>e.g.</u>, <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 695-96 (8th Cir. 2003) (harmless error analysis in judicial review of decision of the Social Security Administration); <u>Reeder v. Apfel</u>, 214 F.3d 984, 987-88 (8th Cir. 2000) (same); <u>Greene v. Sullivan</u>, 923 F.3d 99, 101 (8th Cir. 1991) (same).

Accordingly, in light of the above, a review of the ALJ's decision shows him to have identified and discussed plaintiff's non-exertional impairments and to have considered such non-exertional impairments in determining plaintiff to have the RFC to perform her past work as a machine operator. Plaintiff's argument otherwise should be denied.

C.   Past Relevant Work

        Plaintiff claims that the ALJ erred by finding plaintiff able to perform her past relevant work as a machine operator inasmuch as the combination of her exertional and non-exertional limitations preclude her from performing such work.   Plaintiff contends that such circumstance was observed by plaintiff's physician who noted plaintiff to report significant discomfort upon the completion of a workday due to the repetitive operation of a foot pedal, as well as the general debilitating effects of diabetes.   Plaintiff further argues that because of such limitations, the ALJ should have continued in the sequential evaluation – instead of "end[ing] his evaluation at step two" (Pltf.'s Brief at p. 13) –  and called a vocational expert to testify regarding all of plaintiff's limitations.

        As an initial matter, the undersigned notes that not later than in early February 2005, plaintiff returned to her past relevant work as a machine operator.   Plaintiff avers that she continued in such work until July 1, 2005.   As such, plaintiff worked at her past relevant work, at a minimum, in excess of four months and was working at the time of the administrative hearing in April 2005 and at the time the ALJ rendered his decision in May 2005. At the administrative hearing on April 11, 2005, plaintiff's counsel requested that plaintiff's current work status be considered by the ALJ as merely a work attempt.   However, for work

lasting more than three months to be considered an unsuccessful work attempt, and thus not considered to be substantial gainful activity precluding benefits,

> it must have ended or have been reduced to the
> non-[substantial gainful activity (SGA)] level
> within 6 months due to the impairment or to
> the removal of special conditions [] related
> to the impairment that are essential to the
> further performance of work and:
>
> a.    There must have been frequent absences
> due to the impairment; or
>
> b.    The work must have been unsatisfactory
> due to the impairment; or
>
> c.    The work must have been done during a
> period of temporary remission of the
> impairment; or
>
> d.    The work must have been done under
> special conditions.

Social Security Ruling 84-25, 1984 WL 48788, at **2-3 (1984).

There is no evidence in the administrative record or otherwise demonstrating that the cessation of plaintiff's work in July 2005 was accompanied by frequent absences due to her impairment; unsatisfactory work due to her impairment; the performance of work during a period of temporary remission of her impairment; or that her work had been performed under special conditions.  See Andler v. Chater, 100 F.3d 1389, 1392-93 (8th Cir. 1996).  In the absence of such evidence, plaintiff could be regarded as having performed substantial gainful activity during this period and disability

benefits would be denied on such basis.  SSR 84-25.  The ALJ
appears to acknowledge this possibility, noting that plaintiff had
"just recently returned to her past job and *this could represent
substantial gainful activity after a period of time.*"  (Tr. 15.)
Nevertheless, neither the Appeals Council nor the Commissioner in
his Brief in Support of the Answer raised plaintiff's possible
performance of substantial gainful activity during this period as
a basis upon which disability benefits should be denied.  As such,
the Court will not dispose of the action on the basis of such
possibility and will proceed with plaintiff's claim that the ALJ
erred in finding plaintiff able to perform her past relevant work.

In this cause, the ALJ considered plaintiff's past
relevant work as a machine operator and determined plaintiff's
exertional and non-exertional limitations not to preclude her
performance of such work.  In making this determination, the ALJ
addressed the demands of such work and noted plaintiff's testimony
that despite her fatigue, she could keep up with such demands; that
although she described changing work conditions, her mental health
counselor supported her return to work; that she responded well to
mental health treatment and functioned well as a result; that
plaintiff's thyroid cancer and diabetes imposed no functional
limitations; and that the combination of plaintiff's exertional and
non-exertional impairments resulted in specific functional
limitations, but that such limitations did not preclude plaintiff's

past relevant work. Substantial evidence on the record as a whole supports these findings. Indeed, the ALJ noted that plaintiff had returned to and was performing such work, albeit with some discomfort. Dr. Young's June 2005 observation that plaintiff experienced discomfort at the end of the workday does not detract from the ALJ's findings. <u>Cf.</u> <u>Nettles v. Sullivan</u>, 956 F.2d 820, 823 (8th Cir. 1992) ("Although the claimant may suffer serious back pain and cannot work without discomfort, she has continued to work despite her alleged pain.")

A claimant will be found not to be disabled if she retains the RFC to perform the actual functional demands and job duties of a particular past relevant job. <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996). Here, the functional demands and job duties of plaintiff's past relevant job as a machine operator entailed lifting no more than twenty pounds occasionally and ten pounds frequently. The job involved sitting one hour and standing seven hours of an eight-hour workday. The job involved occasional stooping and handling, and frequent reaching. Plaintiff supervised no other people in this job and did not write or complete reports. (Tr. 134-35.) The ALJ here found plaintiff's only limitations to be lifting no more than twenty pounds occasionally and ten pounds frequently. Because the only limitations suffered by plaintiff did not prevent her from performing the actual demands of her past relevant work, the ALJ did not err in finding her able to perform

such past work.  <u>Jones</u>, 86 F.3d at 826.  As discussed <u>supra</u> at Section V.B, the ALJ considered plaintiff's non-exertional impairments when determining plaintiff's ability to perform work-related activities.

To the extent plaintiff claims that the ALJ should have elicited testimony from a vocational expert regarding plaintiff's exertional and non-exertional impairments, the undersigned notes that such testimony is required only when a claimant carries her burden of showing that she is incapable of performing her past relevant work.  <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996). Inasmuch as the plaintiff did not carry her burden here, the ALJ was not required to call a vocational expert.

To the extent plaintiff argues that the ALJ erred by terminating his analysis at Step 2 of the sequential evaluation, plaintiff's claim is without merit.  A review of the ALJ's decision shows the ALJ to have analyzed plaintiff's claim through Step 4 and to have properly terminated such analysis upon his finding that plaintiff could perform her past relevant work.  20 C.F.R. § 404.1520(f).

D.    <u>20 C.F.R. § 416.969a(b) and Appendix 2</u>

Plaintiff contends that the combination of her exertional and non-exertional impairments shows her to meet the criteria of disability as set out in Appendix 2 as referenced in 20 C.F.R. § 416.969a(b), and that the ALJ erred in not applying this section.

Section 416.969a(b) states as follows:

> Exertional limitations. When the limitations
> and restrictions imposed by your impairment(s)
> and related symptoms, such as pain, affect
> only your ability to meet the strength demands
> of jobs (sitting, standing, walking, lifting,
> carrying, pushing, and pulling), we consider
> that you have only exertional limitations.
> When your impairment(s) and related symptoms
> only impose exertional limitations and your
> specific vocational profile is listed in a
> rule contained in Appendix 2, we will directly
> apply that rule to decide whether you are
> disabled.

20 C.F.R. § 416.969a(b) (2006).

As referenced in this section, Appendix 2 is set out at 20 C.F.R.,
Pt. 404, Subpt. P, and contains the Medical-Vocational Guidelines.
See 20 C.F.R. § 416.969a(a) (2006).

The Medical-Vocational Guidelines in Appendix 2 are to be
used in cases where "the individual's impairment(s) prevents the
performance of his or her vocationally relevant past work." 20
C.F.R., Pt. 404, Subpt. P, App. 2 § 200.00(a). Inasmuch as the ALJ
here properly determined plaintiff able to perform her past
relevant work, his failure to rely on the Guidelines to find
plaintiff conclusively disabled was not error.

## VI. Conclusion

For the reasons set out above on the claims raised by
plaintiff on this appeal, the ALJ's determination is supported by
substantial evidence on the record as a whole and plaintiff's

claims of error should be denied.  Because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff is not disabled should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE



Dated this _26th_ day of March, 2008.